**SIGNED this 20 day of February, 2019.**



_James P. Smith_
**James P. Smith
Chief United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | | |
|---|---|---|
| In the Matter of: | : | Chapter 7 |
| | : | |
| WILLIAM D. WALKER, | : | Case No. 18-30213-JPS |
| Debtor | : | |
| | : | |
| ERNEST V. HARRIS, TRUSTEE | : | |
| Plaintiff | : | |
| vs. | : | Adversary Proceeding |
| | : | No. 18-03006-JPS |
| THE GUARDIAN LIFE INSURANCE | : | |
| COMPANY OF AMERICA, | : | |
| Defendant | : | |

BEFORE

James P. Smith
United States Bankruptcy Judge

APPEARANCE:

    For Trustee/Plaintiff:    Ernest V. Harris
                                         Harris & Davis, P.C.
                                         P.O. Box 1586
                                         Athens, GA 30603

    For Defendant:              G. Marshall Kent, Jr.
                                         H. Sanders Carter, Jr.
                                         Fox Rothschild LLP
                                         Regions Plaza, Suite 2300
                                         1180 West Peachtree, N.W.
                                         Atlanta, GA 30309

**MEMORANDUM OPINION**

In this adversary proceeding, Trustee seeks to avoid as a preferential transfer a payment that Debtor made to Defendant. The parties have filed cross-motions for summary judgment and briefed the issues. The Court, having considered the record, the affidavits and the applicable law, now publishes this memorandum opinion.

FACTS

The facts are not in dispute, except as expressly noted.[1] Debtor was employed by Advanced Technology Services, Inc. ("ATS"). Pursuant to a Group Policy ("Policy"), Defendant Guardian Life Insurance Company of America ("Guardian") provided employees of ATS with long term disability ("LTD") insurance. Under the Policy, if Debtor became disabled, he was entitled to receive a monthly LTD benefit after satisfying a 180-day elimination period. The Policy provided:

> A covered person's *monthly benefit* is determined as shown below:
>
> (a) Multiply his or her *insured earnings* by 50%.
> Round this amount to the nearest dollar.
>
> ...
>
> (c) From his or her *gross monthly benefit*, subtract the amount of any income listed in "Income We Integrate With" that he or she receives or is entitled to receive. The result is his or her *monthly benefit*.

---

[1] The material facts are taken from Docket ("Doc.") Nos. 15, 19, 20, 25 and 26. None of the parties' disagreements about the facts are material to the issues in this case.

Doc. No. 15, Exhibit 2, Policy p. 72 (emphasis in original).

"Income We Integrate With" included Social Security disability and retirement benefits. Id. at 72-73. Thus, as relevant in this case, Debtor's LTD monthly benefit would be 50% of his insured earnings minus any benefit he received from Social Security.

The Policy required that Debtor apply for other income benefits, including Social Security, to which he might be entitled and to appeal any denial. Under the Policy, Guardian could reduce Debtor's monthly LTD benefit by the "estimated amount" of other income that he was expected to receive, including Social Security disability and retirement benefits. However, Debtor could enter into a reimbursement agreement whereby Guardian would not reduce his LTD benefit by the "estimated amount" of other expected income. Instead, the Policy provided:

> But we will not take this estimated amount into account if he or she signs our reimbursement agreement. In this agreement, the covered person promises: (a) to apply for any benefits for which he or she may be eligible; (b) to appeal any denial of such benefits until all possible appeals have been made; and (c) to repay any amount we overpaid due to an award of such benefits.

Id. at 74.

The Policy also provided:

**Overpayment Recovery.** If we overpaid a covered person, he or she must repay us in full. We have the right to reduce his or her payment or apply any benefits payable, including the minimum payment, toward recovery of the overpayment.

Id.

Further, the Policy provided:

**Duties of Covered Persons.** A covered person's primary duties under this *plan* are listed below:
...

4

      (j) If we overpay benefits, promptly report and repay any amount overpaid.

<u>Id</u>. at 65-66.

    Debtor experienced severe back pain, resulting in his inability to work. Guardian received from Debtor a claim for LTD benefits dated August 4, 2014, reporting that he became disabled on February 17, 2014, at age 62. Based on his age and pre-disability income, Debtor was eligible for a monthly LTD benefit of $2,461, payable for 3.5 years, subject to integration with other benefits he might receive. Guardian also received a Long Term Disability Reimbursement Agreement dated December 2, 2014, signed by Debtor by which he elected to receive a full monthly LTD benefit, without any reduction for estimated benefits he might receive from other sources. The Reimbursement Agreement provided:

> The plan under which I am covered provides that my Group Long Term Disability benefits will be reduced by the amount of Other Sources of Income which I or my dependents (should my contract allow reduction of dependent benefits) may be eligible to receive.
>
> The plan also provides that if I do not apply for these Other Sources of Income, my Long Term Disability benefits will be reduced by the amount of benefits which I would be eligible to receive if I had made application. I further understand that Guardian is entitled to consider such Other Sources of Income as being received where claim therefore is pending.
>
> In the event that application has been made with respect to any Other Sources of Income for which I or my dependents (if applicable) may be eligible to receive, I understand that Guardian will waive its assumption of an estimated amount of said benefits until such time as a decision has been made.
>
> In exchange for Guardian's agreement to waive its assumption of any Other Sources of Income for which I may be eligible, I hereby agree to reimburse Guardian for any resulting overpayment in the event that I am found to be eligible. I further agree to notify

>Guardian of any and all decisions concerning any Other Sources of Income, immediately upon being informed of same.
>
>**... I further agree to immediately reimburse Guardian for any overpayment resulting from benefits which were paid without reduction from Social Security Disability/Retirement (primary and dependent benefits, if applicable)....**

Doc. No. 15, Exhibit 5 (emphasis in original).

Guardian began paying Debtor a monthly LTD benefit in the full amount of $2,461, with no reduction for Debtor's anticipated receipt of Social Security benefits. LTD benefits were paid to Debtor from August 2014 to February 2018 in the total amount of at least $98,440[2], when his 3.5 year maximum benefit period ended. Doc. 15, ¶¶ 22-24.

Nearly three years after the Reimbursement Agreement was signed, Debtor provided Guardian with a Notice of Award from the Social Security Administration dated September 23, 2017, stating that he became eligible for Social Security disability benefits beginning August 2014. The Notice also states that Debtor would receive a monthly Social Security retirement benefit of $2,222 beginning May 2017 (when Debtor turned 66 years old). Debtor, some time thereafter, received a check, apparently via direct deposit into his bank account, from the Social Security Administration as a lump sum payment of retroactive disability benefits for the period September 2014 through August 2017.[3]

On December 21, 2017, The Advocator Group, an independent contractor retained to assist insured employees with Social Security claims, submitted a notice to Guardian showing

---

[2] Trustee asserts that the total payments exceeded $98,440.

[3] Because he has since closed his account and no longer has electronic access to his bank statements, Debtor is unsure of the amount of this lump sum payment but believes that it was approximately $86,000.

that Debtor was awarded monthly disability benefits effective August 1, 2014, and that Debtor received a retroactive award of disability benefits in the lump sum of $77,376. Pursuant to the Reimbursement Agreement, by letter dated December 22, 2017, Guardian informed Debtor of the total unreduced LTD benefits paid to him under the Policy ($98,440), as well as the amount that should have been paid by Guardian ($5,668) if his monthly LTD had been reduced by his Social Security disability and retirement benefits, and requested reimbursement of the resulting overpayment of $92,772. The letter provided Debtor with the calculations by which the overpayment had been determined and stated, in part: "**Overpayment Recovery:** If we overpaid a covered person, he or she must repay us in full." The letter also informed Debtor of his rights under ERISA to appeal Guardian's calculation and to initiate litigation. Debtor did neither.

According to his affidavit[4], after receiving Guardian's letter, Debtor had ten or more telephone conversations over a two week period with Guardian and The Advocator Group questioning whether he was legally obligated to pay Guardian the $92,772. Debtor stated that he specifically asked both Guardian and The Advocator Group what would happen if he did not make the payment and both told him that he would be sued. In her affidavit, Melanie Wiltrout, a Team Leader at Guardian, stated that Guardian has no record of any such telephone conversation with Debtor. Debtor further stated that he became very upset because he knew that if he paid Guardian, he then could barely pay his living expenses and definitely could not pay any of his other creditors who had not been paid in over two years. Debtor stated that his only income was his Social Security retirement benefit. Debtor decided that he had no alternative but to pay Guardian. Debtor stated that, under duress, he made the payment by sending Guardian an official

---

[4] Doc. No. 20.

bank check dated January 8, 2019, in the amount of $92,772.

On February 14, 2018, Debtor received service of a lawsuit filed by one of his creditors. On advice of counsel, Debtor filed his voluntary Chapter 7 petition on March 5, 2018.

## DISCUSSION

Trustee seeks to avoid as a preferential transfer, under 11 U.S.C. § 547(b), the $92,772 payment that Debtor made to Guardian. Section 547(b) provides:

> (b) Except as provided in subsections (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> (3) made while the debtor was insolvent;
> (4) made–
>     (A) on or within 90 days before the date of the filing of the petition; or
>     (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
> (5) that enables such creditor to receive more than such creditor would receive if–
>     (A) the case were a case under chapter 7 of this title;
>     (B) the transfer had not been made; and
>     (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

Trustee has the burden of proving the avoidability of the transfer under subsection (b). If the trustee carries his burden, the burden then shifts to the transferee to prove a defense under section 547(c). 11 U.S.C. § 547(g).

The facts show Debtor's payment was made within 90 days of his bankruptcy filing. Guardian offers no evidence to refute the statutory insolvency presumption. 11 U.S.C. § 547(f). However, Guardian argues that the other elements of section 547(b) are not met because the

payment was not payment on an antecedent debt owed by Debtor. As will be explained below, the Court need not decide, but will assume that all of the elements of section 547(b) have been met.

Guardian argues that the payment is protected by the "ordinary course of business" defense[5]. Section 547(c)(2) provides:

> (c) The trustee may not avoid under this section a transfer–
> ...
> (2) to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was–
>> (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or
>> (B) made according to ordinary business terms;

Thus, the statute requires a two-step analysis. First, the court must determine whether the *debt* that was paid was incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee. 11 U.S.C. § 547(c)(2). As this court explained in Kelley v. McCormack (In re Mitchell), 548 B.R. 862 (Bankr. M.D. Ga. 2016),

> Case law addressing this element in the context of a consumer's financial affairs seems particularly sparse. Consumer cases present unique challenges, for many transactions (such as buying a car or house) are quite ordinary among the general population, yet often unprecedented in the consumer's life.
>
> ...[T]he growing trend in the case law is clear as to the first element–a transfer made pursuant to a first-time transaction debt can fall within the ordinary course exception if the transferee can show that the debt would be considered as occurring ordinarily between similarly situated parties....

---

[5] Guardian also asserts recoupment, constructive trust and equitable lien as defenses. For the reasons stated below, the Court does not need to address these defenses.

9

As the Ninth Circuit has observed:

> When there are no prior transactions with which to compare, the court may analyze other indicia, including whether the transaction is out of the ordinary for a person in the debtor's position, or whether the debtor complied with the terms of the contractual arrangement, generally looking to the conduct of the parties, or to the parties' ordinary course of dealing in other business transactions.

*In re Ahaza Sys., Inc.*, 482 F.3d at 1126 (9th Cir. 2007) (quoting *Meeks v. Harrah's Tunica Corp. (In re Armstrong)*, 231 B.R. 723, 731 (Bankr. E.D. Ark. 1999) (citations omitted)). "[H]owever, this analysis should be as specific to the actual parties as possible." *Id.* "Only if a party has never engaged in similar transactions would we consider more generally whether the debt is similar to what we would expect of similarly situated parties, where the debtor is not sliding into bankruptcy." *Id.*

Id. at 891-92.

The second step is to then determine whether the *payment* was made in the ordinary course of business or financial affairs of the debtor and the transferee *or* according to ordinary business terms of the industry in question. With respect to the ordinary course of business or financial affairs of the debtor and the defendant (section 547(c)(2)(A)):

> Where parties have no extensive history of credit transactions to which a disputed payment can be related, their express agreement furnishes the most informative evidence left to consider of the ordinariness of a transaction from the parties' perspective.

Id. at 894 (internal quotations and citations omitted). On the other hand:

> The inquiry under § 547(c)(2)(B) is whether the transfer was made on ordinary business terms, which, in the Eleventh Circuit, requires proof of some objective standard. Carrier Corp. v. Buckley (In re Globe Mfg. Corp.), 567 F.3d 1291, 1298 (11th Cir. 2009) ("The 'ordinary business terms' requirement, by contrast is objective in nature, requiring proof that the payment is ordinary in relation to

>   prevailing industry standards.") <u>Flatau v. Curington, LLC (In re Nobles)</u>, No. 09-5106, 2010 WL 3260128 at, *4 (Bankr. M.D. Ga., Aug. 18, 2010); <u>Markham v. Lerner (In re Diagnostic Instrument Grp., Inc.)</u>, 283 B.R. 87, 95 (Bankr. M.D. Fla. 2002) (citing <u>Miller v. Fla. Mining & Materials (In re A.W. & Assocs., Inc.)</u>, 136 F.3d 1439, 1442 (11th Cir. 1998)).

<u>Id.</u> at 893-94.

Guardian relies upon <u>Gardner v. Recovery Services Int'l, Inc. (In re Shepherd)</u> 585 B.R. 864 (Bankr. E.D. Ky. 2002), whose facts are almost identical to those in this case. The debtor was covered by group LTD insurance through his employer. The debtor became disabled and elected to receive full benefits while he awaited award and payment of Social Security benefits. Under the insurance agreement, the debtor agreed to then repay or have withheld from future benefits a percentage of the Social Security award. After the debtor received payment of his Social Security award, the insurance company calculated the overpayment at $7,465.10 and sent the debtor a letter showing the calculations. Two weeks later, the company's recovery agent sent the debtor a letter seeking recovery of the overpayment. One month later, the debtor mailed a check for $6,454.10. Shortly thereafter, the debtor filed a Chapter 7 case and the trustee sought to recover the $6,454.10 payment as a preferential transfer.

The court held:

>   4. First, the payment was for a debt incurred in the course of ordinary business dealings between Shepherd and LICNA. *In re Carled Inc.*, 91 F.3d 811, 813 (6th Cir. 1996). Both Shepherd and LICNA were engaged in their usual business as insured and insurer pursuant to the contract. The debt was incurred according to the specific language of the insurance policy, and payment of the debt was in compliance with that policy.
>
>   5. Second, the debt and the payment were ordinary in relation to other business dealings between the debtor and creditor. *In re*

11

> *Carled*, 91 F.3d at 813. The fact that the payment was a one-time
> or first time transaction does not automatically exclude it from
> being in the "ordinary course of business." *In re Finn*, 909 F.2d
> 903, 908 (6th Cir. 1990). Thus, the reimbursement payment made
> by Shepherd to RSI was "ordinary" despite the fact that it was a
> first time occurrence. The timing, amount, and manner of payment
> as well as the circumstances under which it was made all indicate
> that the transaction was ordinary between the parties. *In re Russell
> Cave Co., Inc.*, 259 B.R. 879, 882 (Bankr. E.D. Ky. 2001). Stated
> another way, there was nothing unusual about the transaction
> between Shepherd and LICNA which disqualifies it from the
> "ordinary course of business" exception to subsection 547(b).
> Shepherd paid $6,454.10 of the $7,465.10 calculated by LICNA, in
> 43 days of the request for payment by LICNA and within 30 days
> of the request by RCI.
>
> 6. The third, and final, prong of the "ordinary course of business"
> test is whether the payment was made according to ordinary
> business terms. *In re Carled*, 91 F.3d at 813. To meet this prong,
> the defendant must show that the transaction "comports with the
> standard conduct of business in the industry." *In re Russell Cave*,
> 259 B.R. at 883. Insurers generally do not permit double recovery
> of any kind, and they routinely recover overpayments pursuant to
> the terms of their policy. LICNA's recovery was standard conduct
> for the insurance industry.

Id. at 866-67[6].

Trustee argues that this Court should not follow Shepherd because it was not reported until 2018, some 16 years after it was decided. The Court has no explanation as to the reason for the delay in reporting a decision originally issued in 2002. However, the reasoning of the case is consistent with the decision of this Court as discussed above.

Guardian submitted the affidavit of Melanie Wiltrout, who is employed by Guardian as a

---

[6] This case was decided before the 2005 amendment to section 547. Prior to the amendment, the ordinary course of business defense required the defendant to prove both the ordinary course of business between the parties and the ordinary business terms as defined by the relevant industry standards.

12

Team Leader and has eleven years of experience in the insurance industry.[7] She previously managed LTD claims for Guardian. In her affidavit, Ms. Wiltrout stated that the usual course of business for a group disability insurer is to give an insured employee the option of receiving full, unreduced monthly benefits while a claim for other income benefits is pending, if the insured signs a reimbursement agreement, as was done by Debtor. Ms. Wiltrout stated that the letter dated December 22, 2017, Guardian sent to Debtor requesting that he reimburse the overpaid benefits is the type of request made routinely and in the ordinary course of business by Guardian and other insurers which issue group LTD policies. She also stated that, based upon her experience in the insurance industry, the underlying claim transaction between Guardian and Debtor, including Debtor's execution of the Reimbursement Agreement and his reimbursement of overpaid benefits advanced by Guardian, occurred in the ordinary course of business of Guardian and Debtor. She stated that Debtor's LTD claim was administered, including the reimbursement of benefits that were overpaid by Guardian, in accordance with the mutual obligations of Guardian, as the insurer, and Debtor, as the insured, pursuant to ordinary business terms in the insurance industry, and consistent with the terms of the Plan, the Policy and the Reimbursement Agreement. Furthermore, the timing, amount and manner of Debtor's repayment, as well as the surrounding circumstances, were based on standard insurance industry practices and the prior course of dealing between Guardian and Debtor. Ms. Wiltrout stated that Guardian did not enter into a special arrangement with Debtor so it could be placed ahead of other creditors. Ms. Wiltrout stated that coverage under the group LTD Policy had been

---

[7] Doc. No. 25, Exhibit 10. Trustee offers no evidence to contradict Ms. Wiltrout's affidavit.

provided to employees of Debtor's employer since 2007. She stated that when the Policy was issued and Debtor signed the Reimbursement Agreement, Guardian had no reason to anticipate that Debtor would file for bankruptcy relief.

Here, the evidence establishes that the debt between Guardian and Debtor was incurred under circumstances similar to those which would exist between a similarly situated disabled employee and his insurance company, when the employee receives disability payments and is then asked to refund some of those payments upon receiving an overpayment of benefits from another source. Further, the debt was incurred pursuant to the terms of the contract between the parties. There was nothing at all unusual about the transaction when viewed in relation to similarly situated parties. Accordingly, the Court finds that the debt was incurred in the ordinary course of business or financial affairs of Debtor and Guardian.

Trustee argues that the Policy required Debtor to "...promptly report and repay any amount overpaid." Doc. No. 15, Exhibit 2, Policy p. 66. Trustee argues that, since the repayment was made approximately 4 months after Debtor received his Social Security payment, the payment was not "ordinary". However, Guardian did not learn of the amount of Debtor's Social Security disability payment until it received the December 21, 2017 notice from The Advocator Group. It then immediately calculated the amount of the overpayment and made demand for repayment by letter dated December 22, 2017. Thus, from a technical standpoint, Debtor's legal obligation to repay Guardian may have arisen on the date he received his Social Security disability benefits. However, from a practical standpoint, the obligation to repay did not arise until Guardian had calculated the amount of overpayment and made demand for repayment.

In addition, Debtor paid with a bank check dated January 8, 2019. Although there is no

14

evidence as to when or how the check was actually delivered to Guardian, Trustee does not raise an issue as to any unreasonable delay between the date of issuance of the check and the date of its delivery to Guardian. The check was dated approximately 16 days after the demand by Guardian. The relevant documents (the Policy, Reimbursement Agreement and demand letter) contain no specific date by which payment was to be made. Where a contract provides no express time term, "a reasonable time for performance [is] implied" by Georgia law. Read v. GHDC, Inc., 254 Ga. 706, 706, 334 S.E. 2d 165, 166 (1985). The Court finds that payment within 16 days of demand is not an unreasonable period of time.

Because there is no history of credit actions between the parties, the Court finds that Debtor's payment was in the ordinary course of business or financial affairs of Debtor and the transferee because his payment was consistent with the terms of the Policy and Reimbursement Agreement. In the alternative, the Court also finds that the payment by Debtor to Guardian was consistent with industry standards and therefore made according to ordinary business terms.

Citing the case of Jubber v. SMC Elec. Prods. (In re C.W. Mining Co.), 798 F.3d 983 (10th Cir. 2015), Trustee argues the ordinary course of business defense does not apply because Guardian engaged in unusual collection practices. Trustee asserts that Guardian threatened to sue Debtor who then paid under duress and that the payment ($92,772) was a higher amount than Debtor received from Social Security benefits. The Eleventh Circuit has also noted that payment in response to unusual collection practices takes a payment out of the ordinary course of business exception. In Marathon Oil Co. v. Flatau (In re Craig Oil Co.), 785 2d 1563 (11th Cir. 1986), the Eleventh Circuit stated:

> In describing the ordinary course of business exception, Congress stated that

15

> its purpose is to leave undisturbed normal financial relations, because [such an exception] does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditor during the debtor's slide into bankruptcy.
>
> H.R. Rep. No. 595, 95th Cong., 1st Sess. 373-74 (1977), *reprinted in* 1978 U.S. Code Cong. & Ad.News 5787, 6329. It seems clear from this statement that § 547(c)(2) should protect those payments which do not result from "unusual" debt collection or payment practices. To the extent an otherwise "normal" payment occurs in response to such practices, it is without the scope of § 547(c)(2). Thus, whenever the bankruptcy court receives evidence of unusual collection efforts, it must consider whether the debtor's payment was in fact a response to those efforts.

Id. at 1566.

Examples of unusual collection practices are found in the cases of Lightfoot v. Amelia Maritime Serv., Inc. (In re Sea Bridge Marine, Inc.), 412 B.R. 868 (Bankr. E.D. La. 2008), (payments made after emails and letters threatening legal action); Seaver v. Allstate Sales & Leasing Corp. (In re Sibilrud), 308 B.R. 388, 396 (Bankr. D. Minn. 2004) (collection of cases showing repeated phone calls to debtor, creditor's refusal to deliver new merchandise unless payment made on outstanding invoices, new requirements of letter of credit, down payment and prepayment, and executing settlement agreement to resolve legal action); and Percision Walls, Inc. V. Crampton, 196 B.R. 299, 304-05 (D.E.D. N.C. 1996) (subcontractor faxed letter to debtor-general contractor stating it would seek payment from property owner if not paid within 3 days resulting in unusual collection method). But see, Schoenmann v. BCCI Constr. Co. (In re Northpoint Commc'n Group, Inc.), 361 B.R. 149, 158-59 (Bankr. N.D. Cal. 2007) (letter stating that creditor would file mechanics liens if not paid promptly not unusual collection action even

16

though it had never before sent a letter regarding an overdue invoice; letter stated only the obvious about preservation of mechanics lien rights, did not threaten work stoppage or legal action and debtor itself had requested summary of amounts due).

In this case, there were no multiple demand letters or emails, legal action, referral to collections or threats to withhold goods or services. The December 22, 2017 letter from Guardian advising Debtor of the overpayment and requesting repayment thereof contained no threat of legal action. Although, according to Debtor, both Guardian and The Advocator Group advised him that he would be sued if he did not pay, this was merely stating the obvious. There is no allegation that they actually threatened legal action.

All creditors have the right to sue to collect amounts legally due them and most, if not all, debtors realize this. Further, any debtor with limited resources who pays one creditor necessarily has less resources to apply to his other creditors. Thus, any "duress" that Debtor felt regarding the possibility of suit and the inability to pay other creditors was not unique to this transaction. If payment under such circumstances would justify a denial of the ordinary course of business defense, the Court cannot imagine any circumstances in which the ordinary course of business defense would apply. Thus, the Court finds that Debtor's "duress" does not deprive Guardian of the ordinary course of business defense.

Finally, Trustee argues that Debtor repaid Guardian more ($92,772) than he received from Social Security. However, according to The Advocator Group, the retroactive Social Security disability payment to Debtor was $77,376, covering disability payments through August 2017. Debtor admitted in his affidavit that he also received monthly payments of $2,215 from Guardian from September 2017 through December 2017, and Social Security retirement

payments of $2,222 for October 2017 through December 2017.  Doc. No. 20, ¶¶ 6 and 7. Guardian's December 22, 2017 letter contained the calculations by which Guardian determined the amount of the overpayment.  Trustee has failed to show how these calculations are in error. Accordingly, Trustee has presented no facts upon which this Court can conclude that Debtor repaid Guardian more than his legal obligation under the Reimbursement Agreement.

In conclusion, the Court finds that, even assuming Trustee could establish all of the elements under section 547(b), Guardian has established the ordinary course of business defense under 11 U.S.C. § 547(c)(2).  For this reason, there is no need for the Court to address other defenses asserted by Guardian.  Guardian's motion for summary judgment is granted and Trustee's motion for summary judgment is denied.  An order consistent with this opinion will be entered.

*END OF DOCUMENT*